Our next case for argument is 23-1860, Campbell v. United States Postal Service. May it please the court, opposing counsel, Donald Gallick on behalf of appellant Stacia Campbell. We're here today on three issues for this court to consider. I will say issues one and three are the most, I think, the strongest issues. I'm happy to talk about all three, of course. This is an employment case, as I'm sure the court is aware. And the first issue, I think, is most germane, and that is that Ms. Campbell never had a neutral and unbiased decision maker. Now, in the 2023 decision, the MSPP says, well, you know, that's a new issue, and we're not going to review it. So the 2023 decision, we're not going to get into whether or not she had an unbiased person who decided to terminate her. That wasn't brought up down below. But if you read the 20s... Was it brought up to the initial administrative judge? In the 20... It was. And also in the 2016 opinion... I thought you challenged the bias of the... Or that the proposing official was the wrong one initially, and then you changed your argument on your petition for review to the deciding official. I believe if you look at the 2016 opinion, I think that would be Appendix 21, the court actually... Or the MSPB says, appellant has failed to submit any evidence that she was actually biased, that she actually had a prejudice against her. So the bias and the prejudice argument was made going back prior to 2016 and the initial decision. But in the 2013 decision, they say, no, that was waived, that it was waived and there was no evidence brought up to this. In my brief, I point out that an email was sent before any criminal case was charged, before any predisciplinary investigation occurred, that Ms. Reed sent an email saying, how do we terminate Ms. Campbell? And that's mentioned in the brief that I filed with this court. And that came out the predis... Besides the email that you're talking about right now from Ms. Reed, what other evidence do you have to support your argument that there was bias? Other than the email saying, what do we have to do to terminate her? I don't know, but that's pretty strong evidence. Okay, so that's the only piece of evidence you're relying on in that case. I think so. I will say, I was not counsel during the predisciplinary initial investigation, but I've been on this case for some time, so I was not privy for that. But I think an email, it's like the old West joke, we catch a cattle rustler and we should execute him. And the sheriff says, no, let's give him a fair trial and then we can execute him. I mean, we're going to execute him no matter what, but we'll just pretend to have a fair trial before we bring out and give the death sentence. In an employment case... I mean, didn't, at the hearing, that deciding official testify that she hadn't pre-decided the case? Well, she said, yeah, I was biased against her, but I'm going to still have an open mind. I think that could be... I don't think she said she was biased against her. Well, there is in the 2016 opinion and 23, it seems to be accepted that these people don't like each other. These two people don't like each other. And in fact... Can we be precise in terms of the language? Can you point us to a page? Well, I can. I think that the email... I'll look for that as I'm going through where the email is actually discussed. It also comes up, and I think this goes to bias as well, that this arrest was publicized and that her agency put out a press release publicizing this criminal charge and then brought up that Stassia Campbell brought bad publicity to the agency. But Ms. Campbell didn't publicize this theft. Well, did this specific deciding official issue the press release? Well, it was someone in the agency. Well, can we get extinct to your argument about this specific deciding official? Because I don't see why an email from a higher level supervisor, when they find out that somebody has committed serious misconduct and sends to, I don't know who, what, the HR office, whoever, saying, how do we terminate this person? Because they've determined that this is a terminable offense, and then they find out the information. This is... Maybe they should have said, what steps do we need to undertake to determine what's the appropriate discipline for this? But that's not the way people talk in real life. I mean, if this is an offense that supports a potential termination, and I think it's clear it does, you haven't cited any agency table of penalties, I think, that shows this isn't a possible offense for what she did. Then, what's wrong with saying, how do we terminate her? I mean, the answer could have been, back from the HR person, that says, you can't. This is a first offense. Under our table or our penalties, she can only be suspended. There's a lot of issues in your question. One is, I cite multiple cases where you have postal workers who, apparently violence is not as big a deal as this misdemeanor theft offense. The other cases aren't what I'm asking about. Do you have something that suggested that it was completely unlawful to terminate this person who was a high level, wasn't she the postmaster? At two locations, exactly right. Right, so she was the postmaster, which means she's in charge of that location, and she's improperly using her government-issued, financed, is it a credit card? It's called a Voyager card. She's putting fuel in her car because she has to drive it now between two post offices that are approximately 60 miles away. Yeah, but she wasn't allowed to use it for that purpose. Well, and issue two is, and I say I don't want to focus too much on issue two. No, but, well, let's stick to issue one then. Well, sure. What is biased about a deciding official saying, look, this person is the highest ranking person in the post office. She has misused her government credit card. We need to terminate her because this looks bad for the agency. Prejudice is to prejudge, to be etymological with it. But she testified, so if you're going to ask us to draw a factual inference, whether she prejudged or not, you're going to lose because she testified that she did not prejudge this. And we, if it's a factual question, it's substantial evidence review, and her testimony supports the opposite view. Isn't that right? That's the standard of the law. But so if you say that, all you have to do is say, I wasn't prejudiced on that day and therefore that solves any problems. I mean, didn't the administrative judge that heard that testimony find her credible? That was their finding. That was their finding. What can we do? We don't overturn credibility findings when the administrative judge heard, it was live testimony, right? That's correct. So the administrative judge sat there, listened to this deciding official, testified that she was not biased and that she kept an open mind and believed that person and did not believe her client. I understand what you're saying, but certainly we see it as a bias factor. And of course, that wasn't the person that was supposed to make the termination decision. And that goes into the MSPB. They say, well, sure, that wasn't the person. They appointed the incorrect person to make the termination order, but that was harmless error as well because anyone would have terminated her in these circumstances. Let me take your issue one. We'll go to issue three because I think it is part and parcel to this. We have cases that I'm citing over and over again where you have postal workers who are threatening violence, who are committing violence, who are challenging supervisors. Are they terminated on first offense? No, not in any of the cases that I cite. They're given last chance agreements. They're given demotions. They're given suspensions. But Ms. Campbell, she has 25 years of experience with no disciplinary record at all, and she has a misdemeanor theft offense, which is inexcusable. What's the standard of our review on this question? Well, you've got the Douglas factors, and then you have, at Spanner, the same decision. But we don't review this de novo, right? We don't apply the Douglas factors and review it de novo. Well, no. Don't we defer to the agency deciding, the agency's selection of penalty unless it's, what's the standard there? Arbitrary, capricious. I mean, I think that's what we're looking at here. One of the Douglas factors they look at is they say, well, look, this case caused a lot of bad publicity for the Postal Service, but they publicized it. They're blaming Ms. Campbell for creating bad publicity for the Post Office when they sent out a press release. I mean, does that seem like bad faith? Does that seem arbitrary or capricious to say, yeah, we publicized her arrest, but it still brought bad publicity due to our press release that we sent out? It's her first offense, 25 years of an exemplary work record. Let's terminate her. I mean, again, this court has to give deference, but it's an unlimited deference. Honestly, I'm a little sympathetic to you on this penalty point, but I think our hands are pretty tied that we defer to the agency's choice of penalty unless it's so grossly disproportionate or it's not within a table of penalties or something like this. But clearly, you haven't made an argument that removal is not an appropriate penalty for a first offense under any table of penalties or things like that. It is. Do we even have a table of penalties here? I don't know the answer to that. I don't. I'm citing case law out of this court. I'm citing case law out of other circuits. The problem with the case law is they're all different factual circumstances. And you have an employee who happens to be the highest-ranking official in two post offices that holds an extreme position of trust. And when she misuses government credit cards, that inures badly to the benefit of the agency's reputation. Threatened violence is bad, too. I mean, theft is bad. Misdemeanor theft is bad. Threatened violence is bad, too. And you can say, well, that's apples and oranges. And I think that's the problem with the Douglas factors and the Singh factors is because the discretion just seems to be unlimited. But we're not going to do anything about that. We've applied the Douglas factors since the very beginning for the creation of the MSPB and the creation of the federal circuit. If the Douglas factors, the agency applies them, and they come off with a penalty that is reasoned and supported by the records, we have to affirm it. But what about saying it's one of the Douglas factors is Campbell brought bad publicity to the agency after we sent out a press release? I mean, it just seems, you know, again, I don't want to take a common-sense approach on this, but it really seems bad faith to say I can't believe you brought bad publicity to me after I sent a press release. It seems like that's we can have differing views on that. It seems to be very bad faith. Ms. Campbell should be retiring right now after 35 years of experience, but no. She was terminated after 25 years for her first offense, a misdemeanor offense. She didn't have counsel at her case. Do you have any near comparator that you think? So as opposed to your example of violence, was there some near comparator that you think we should be looking at in terms of the removal penalty that was imposed? The three or four cases I cite in my brief, I would like this court to compare, but I think you could also come back and say, well, but was that a postmaster? Was that a postmaster working at two different post offices? So it becomes a very complicated analysis where you could say, well, it's not apples to apples, it's apples to pears or something like that. I cite several cases in my brief where you have someone with multiple disciplinary problems who are given a last chance agreement, much more serious than, you know. The theft offense she committed, there's no excuse for that, but she was committing a theft offense to put fuel in her car to drive 50, 60 miles a day to drive from this post office, this other post office, due to a labor shortage. And I was getting enough confidence in me. I have a couple of questions about the facts that just aren't super clear to me from the record. She was eligible to receive mileage reimbursement for making that drive, and there is some testimony in the record to suggest that that process was laborious, took a long time to get your reimbursements. So I guess was she double-dipping or was, and what I mean by that is, was she submitting mileage reimbursements and using her credit card for gas, or was she like, look, I'm going to use my credit card for gas because it's a wash. At the end of the day, I could get mileage back, but that's going to take forever, it's going to be a pain, I'll just use my credit card for the gas, and then I won't seek mileage. I believe the facts, and this is a lengthy record, but I think that she was charged with misdemeanor theft for theft of about $300, and I believe that was all for gasoline. That's not my question. The record reflects that she was actually authorized to get per mile mileage reimbursement. You can't get per mile mileage reimbursement and also get gas. That makes sense. So what I'm trying to ask you for is did she like, did she just say, look, I'm not going to get the reimbursement, I'm just going to go ahead and use my credit card for the gas, or did she try to get both? I know it's only $300, but it matters a little bit, right? It makes her look less bad if she's like, you know what, I'm not going to ask for the mileage, I'm just going to use my credit card for the gas. I know I shouldn't, but I'm going to do this. That makes her look less bad, then I'm going to steak an extra $300 out of it. So I'm trying to figure out which one it is. It's the former. She did both. No, she didn't double dip in this case as far as I know. It's not in the record, is it? No, I don't believe that it is. Well, no, in the record there is some testimony about how hard it was to get mileage reimbursement. So I was assuming maybe from that that she didn't pursue the mileage reimbursement. I didn't know. Ms. Campbell thought this was so innocuous she didn't even take a lawyer into court. She just went to court, like, I shouldn't use the card. No, that's not true. She testified, or there's record evidence that the reason she didn't have a lawyer was because she couldn't afford one, not because she thought it was so innocuous that she didn't need one. Well, there's getting the wing right. You can get appointed counsel. There's a U.S. Supreme Court case on that. She could have had a lawyer at no cost. She might have said the prices were expensive, but she went in and pled guilty at arraignment, which I know this isn't a criminal court, but that doesn't happen a lot. She just went in, I want to get this over with. I'm working a lot. I plead guilty at arraignment. I shouldn't have done it. I apologize. It's all good. One last thing. When she used her credit card for the gas, am I correct in understanding the facts that she actually used other employees' PIN numbers in order to effectuate that? And does that really then, if somebody does some sort of analysis, is it almost like they're the ones stealing? I don't have an answer for that. That is the question. Well, she did use other people's PIN numbers. She didn't put her own in, so she tried to hide. She knew it wasn't just, that's what I'm trying to get at. She wasn't just like, look, I'm just going to go buy this gas because I have to drive back and forth. She bought the gas, and she put in other employees' PIN numbers, making them seem like they were the ones buying the gas. It's something she should not have done, and absolutely, you make a good, we have no defense on that. Thank you.  Thank you. Do we have any paper towels? Jen, will you go get some paper towels? Hold on, just give me a sec. We're going to get this little. Okay, you go ahead. Are you okay to argue with your wet papers? I'm okay to argue. All right, you're okay to argue with the wet papers. We'll clean up a little mess later. Your excipient spilled all over. Your excipient spilled all over the table. Only a patent lawyer laughed at that. Thank you, sir. None of the rest of us know what it means. Please, proceed. Good morning, Your Honor. May it please the Court? Stephanie Fleming for the United States Postal Service. Your Honor, this case is about whether the Board reasonably found that the Postal Service removed for improper conduct a supervisor who pleaded guilty to eight instances of theft. I don't think that this is what this case is about. This case is about, I mean, at least he's made it about, you know, was the penalty reasonable in light of what appear to be some concerning things with the Douglas factors, like the deciding official, Ms. Reed, used the fact that there was publicity about this against, you know, supporting her decision to remove her. And that that was inappropriate, according to opposing counsel, because, for example, the agency was the one who actually did make it public. So how can you, you know, public notoriety, how can you be making something public and at the same time say the fact that it was made public means I have to fire you now? So this is a process. I feel like this is more process. I think, you know, at the end of the day, like you could step back and pretty much anyone could say, okay, look, I think this employee could have been fired for it. I think this employee maybe could not have been fired for it, given her long history of good behavior and all the mitigating factors, whatever. And I don't, I mean, I don't think this is just about that, you know, 10,000-foot level, should somebody be fired for this offense or not. I think that he's alleging specific concerns with the process. So focus on those. Thank you, Your Honor. Let me address both of the ways in which he discussed the publicity and the process. First way was in terms of bias. The plaintiff argued that somehow the deciding official was biased, that the immediate supervisor of the petition was passed over because of a bias. There's no record evidence to support that. Before I start with bias, I know my question was really long-winded, but let me get you on one specific point. He said it was error or misread to use against his client in her decision-making under the Douglas factors the fact that there was publicity over this when it was, in fact, the agency that caused all the publicity over this. So he says that, because here's the thing. Sometimes if we find there's even one factor that was misapplied from a procedural standpoint, we have to send the whole thing back, even if it would otherwise be justified. So he's pointing at this one factor and saying error here. So tell me why that wasn't error. It wasn't error for a couple of reasons. First of all, it was not exclusively the agency that created publicity in this case. Rather, Ms. Campbell was publicly convicted in court as a matter of public record. The specific article that they, in their briefs, discussed as evidence of the publicity was one that, as the administrative judge and the board found, did not just reflect facts in the press release from the agency, but instead found facts in the public record. So the publicity surrounding the case was certainly not caused by the agency. Secondly, the agency deciding official did not actually try to publicize this case. Rather, the Office of Inspector General that investigated the conduct as a matter of routine work issued a press release after they concluded that she had committed theft. That's just something they do once a conviction has been entered. The agency certainly has a right to make it clear to the public when evidence of theft has occurred that they are addressing it. That's part of maintaining the reputation of honesty and integrity before the public and responsible stewardship of tax dollars. So they had every right to publicize it. Just to be clear, it was the agency's Office of Inspector General, so it was the agency, that sent this information to this website. That's what it says on page JA-26 of this record. To be clear, they issued a press release, which was available on the website. They didn't specifically... I'm looking at the actual findings of the MSPB on page JA-26, and they don't say what you just said. On page JA-26, the person we're reviewing, the board, says, Responding to the appellant's argument, this was an unfair factor to consider because the Office of Inspector General had sent the information to the website. What am I missing? I see that, Your Honor. I correct my statement. The Office of Inspector General did send the information, but they sent their press release. They didn't send a statement specifically tailored for the circumstances of this case. They simply provided a copy of the press release. And again, the article that resulted did not exclusively rely upon that press release. Rather, it also looked at evidence in the public record. Yeah, but if the press release was the inspiration for the article... I mean, if LookThisCleveland.com was sitting back like, I don't know what I'm going to write on today. And suddenly, in their email, they get a press release from the post office saying, Hey, look, this person stole from us. We're going to do something about it. Like, huh. You know, if it's the inspiration for the whole article, if the agency is the one putting out there this publicity, why should the agency then say, Oh, Miss Reed, look, look, the public is now really interested in this. You've got a lot of bad publicity, so we're going to have to fire you. Why is that a factor? I mean, it seems pretty circular, like a dog chasing its tail. Well, first, Your Honor, there is no evidence why this particular publication went forward with their article. That isn't established in the record. But more importantly, as the deciding official testified, the existence of the notoriety in the press coverage of the offense was not the reason why she selected removal. And she testified that even had it not been a matter of the public responding to this article, she still would have selected removal. So there's no need for the court to be concerned about whether the fact of the notoriety was caused by the agency or not. The agency would have made the same decision. Okay, fair enough. And that's a really good response to that one. Now, why don't you move over to your bias point that you wanted to address before and touch on. I mean, because we don't often see emails like this where the person who's actually going to make the decision before they're even prevented with it says, How do I fire this person? Well, and I think that the petitioner has now conceded that the email is the only evidence of bias that he has produced or cited to. And to look specifically at it, I think what you'll see is the email is about the conduct, not about a bias. Where is the email in the record? Can you show it to us? Yes, it is. Okay. Okay. It's on appendix 21, Your Honor, and the administrative law judge's decision. That's not the email. That's the administrative law judge's decision. Is the email not in the record? It's cited to the record. It's not independently a part of the record. But you can see it quoted there, Your Honor. And it reads, I want a removal for this. Do we have to do a PDI, which is a predisciplinary interview. So what she says, I want a removal for this, and the testimony reflects she was referring to the OIG report about the behavior that Ms. Campbell engaged in. So she's suggesting she wants a removal for the conduct of theft, which is an entirely understandable reaction. It does not talk about anything that any relationship she had with Ms. Campbell, any impression she had of Ms. Campbell, or any prejudice that she had of Ms. Campbell. And, in fact, what we see from her testimony is that just a month prior to this, Ms. Reed, the deciding official, had recommended Ms. Campbell for a position and then concurred in a promotion for her position. So there's no evidence that she had any bias, quite the contrary. Okay, but maybe there isn't evidence that she had overall bias towards Ms. Campbell. But isn't this, I mean, I don't think I would be really excited if my deciding official, before hearing any of the evidence in my case, say, I want you fired. I want this person fired for this. I would be really bummed. I'd be like, wow, I don't know if I'm going to get a real fair hearing on this. I don't think, is this person really going to consider all my mitigating factors? I mean, they've already decided what they want. I want a removal for this. Well, regardless of what emotional response one might have to the email, the law doesn't require that. In fact, what the law says is if the deciding official, even if they concurred, for instance, with the penalty of demotion, and this was in the Beattie decision affirmed by the Federal Circuit in 1985, that initial impression or direction for a penalty does not prejudice or it's not established bias for the deciding official. A supervisor can change their mind. Counselor, in your opinion, then, you're saying that statement that you quoted from appendix page 21 is not some sort of prejudgment on what the penalty should be? I think that that statement is properly reflecting, as Ms. Reed testified, shock at the conduct that was described in the Office of Inspector General's report and not a final decision that only removal would do. And, in fact, Ms. Reed testified that she kept an open mind. The board found that testimony credible. She testified that she was willing to listen to Ms. Campbell's defenses. Where in this record can I see that testimony? Can you direct me to the transcript of that testimony? Yes. She testified in the transcript on page 73 to 74 that she had not made up her mind when viewing the OIG report. That was the time in which the e-mail was sent. She was just shocked. Do we have that? I don't have anything on page 73. It's not part of the appendix in this case because it wasn't discussed or raised by the appellant, but it was a transcript on which the board relied below. The board cites to that in its opinion, I take it. It would be helpful. I know that primarily the case manager's response for the appendix, but it would be helpful if the government actually gave us the record we needed to look at this case. I appreciate that. I apologize, Your Honor. You can see Appendix 21, the administrative law judge citing the testimony where Ms. Reed said that she kept an open mind as the disciplinary process unfolded, citing her testimony and directing cross. In addition, Ms. Reed met with Ms. Campbell or her counsel twice during the process of considering removal, listened to her arguments. She testified. She listened to her arguments. She simply placed different weight on. Can we cut to the chase here? This really does. I understand our limited review and everything. This seems a little unfair for a 25-year veteran with no service, no disciplinary issues and a first offense for misusing a credit card for $300. Well, the court had asked opposing counsel whether there was a table of penalties. The USPS has no table of penalties. There was nothing regulatory or policy-wise that suggested a particular kind of offense warrants removal. But in this case, while it was the first offense for which she was disciplined, she committed it on eight separate occasions. As I believe Judge Moore pointed out, she didn't simply misuse her own Voyager card. She appropriated the PIN numbers for her employees' Voyager cards and used that on those eight separate occasions. Counsel, did the testimony below talk about consideration of any last chance agreement? There was no testimony supporting that a last chance agreement was considered in this case, but there's no obligation for the agency to have considered it. In fact, none of the cases on which the petitioner relies show a last chance agreement as being required or compelled by a court before a removal decision. And on the few cases where last chance agreements are cited by the petitioner, they were all in a settlement context, which, of course, has a different standard for penalties. Now, do you know the answer to the question that your other counsel didn't know? It's a fact question. There's some evidence in the record that suggests she was allowed to get per diem or per mileage. You know, look, she was pursuant to her job driving back and forth between these two different post offices, right? And so she was allowed to actually get reimbursed for that driving. Is there evidence of whether she did? Because I remember reading something in this record, but I don't remember where, where it was talking about where she testified that it was just really hard to go through all the rigmarole to seek that reimbursement. So I guess what I'm trying to get at is, did she just shortchange it, like, try to make it simpler? Like, OK, I'm just going to use my credit card for the gas. I won't charge the government for the mileage. I just use my credit card for the gas. So it's a wash. Like, was that what was going through? Is there any testimony? My specific question is, did she also seek reimbursement for mileage in addition to using her credit card for gas? She did not. The question of whether she could have requires us to answer whether she was appropriately, you know, using mileage for post office business. And while Ms. Campbell did give that testimony, no one else gave that testimony on the record. There's no evidence to support that all of the gas charges she made were all in furtherance of the post office business. No, but why doesn't that matter? Like, why didn't, if what you said matters a lot to me, it matters a lot to me. And why didn't it matter to the decision maker that she wasn't necessarily, I mean, we're talking about less than $300 for a lady that was driving back. How many miles was it between these two post offices? I don't know. We don't dispute that the total was $326, I believe. Yeah, but I think it's 50 miles, if my recollection is correct, between these two post offices. That is her claim. So she's driving back and forth all the time, and she is legitimately entitled to mileage, which, by the way, is more than the cost of gas, right? Because it also takes into account wear and tear on your car. So if she had put in for mileage, the actual mileage could have been well more than the $300 in gas that she charged. I mean, I get that she might have also stopped and, you know, bought lunch somewhere, and that would have been not official duty. But why wasn't all that taken into account? It just seems really harsh. Well, if I could say, Your Honor, the fact that she didn't put in for mileage could just as easily be seen as evidence that she knew whatever she was doing was not fully appropriate. Oh, she knew what she was doing was not fully appropriate. That's why she walked in and pled guilty. But she was cutting corners. She was cutting corners. Do we know that the actual trips she took would have been authorized for reimbursement?  Because sometimes if you're driving from your house to your workplace or work, that's not – you can't get reimbursement for it. In this case, there's no record establishing that the trips that she took – That it was directly from one post office to another. That's correct. Because, I mean, did she – This is what we know. Did she put in her response to the proposing official or even at the AHA that she was just trying to use this credit card to make it easier to get reimbursement? She did give that testimony. She testified that she was frustrated by the pace at which reimbursements were allowed. Some were directed to the incorrect address, I believe she said. And the agency agreed that there was a longer timeline for some of those reimbursements. That's not in dispute. What is dispute is whether she was entitled to reimbursement for all of those trips. There's no evidence on that. There's no showing. All we see is Ms. Campbell evading the process that the post office required in order to be reimbursed. And part of the way she evaded it is by misappropriating the PIN numbers from her own employees. She didn't even try to put it on her own card. Her actions are not consistent with someone who felt they were doing something legitimate and simply was trying to get paid. There's no doubt. She would not say she knew she was doing something legitimate. That's why she pled guilty. She knew that she was not following proper process, for sure. I have no doubt about that. I don't think he'd stand up and say anything to the contrary. But it just seems so harsh. I mean, how many years of service? Excuse me. How many years of service does this woman have? She had 24 years of service, in which case she should have known very well what the process was that she needed to follow. She knew the process. Stop being all vitriol. No, she knew the process. She pled guilty. And she didn't follow it. She acknowledges she didn't follow it, which is improper, which is the thing for which she's being charged. And it warrants a response by the agency, for sure. But does it warrant termination by somebody who said, I want her job for this at the outset? A supervisor that was misusing the financial system for the office? Yes, it does. And, in fact, the agency emphasized it was her role as a supervisor that gave the most pause about her conduct. That she was setting an example for the people she worked with. Not only did she steal their, excuse me, misappropriate their PIN numbers, she, by her conduct, showed them that they didn't need to follow the rules and regulations related to the reimbursement of finances, which is an important issue for the post office. Her role as supervisor was the single most serious part of the allegation and why removal was warranted here. And the petitioner has identified no comparators or other evidence that suggests that that was disproportionate or otherwise an unreasonable exercise of agency discretion. Okay. Thank you. Let's hear from Mr. Gallek. I appreciate the difficulty in trying to compare these various things and the Douglas factors and Singh factors. You know, all I can tell you is on my brief that I'm sure you've already seen, pages 14, 15, 16, I'm citing 8th Circuit cases. I'm citing D.C. Circuit cases. I'm citing district court cases involving, some involving postmasters, some involving other federal workers who misappropriated a voyage or card. They were not terminated on their first offense. Some they weren't even terminated after multiple offenses. But you could say, well, but that wasn't a postmaster who was in two different post offices. And that wasn't, you could certainly, I could see, parse it out and say they're not totally comparable. So, counsel, what do you think is the most comparable case? If you're kind of giving us the summary and you wanted to point us to one case, what do you think is most comparable? I mean, there's, and I know it's not controlling on this court, but I mean, there's more versus postal service out of the 8th Circuit. But that involved a last chance agreement. But, again, a last chance agreement presupposes there was multiple disciplinary issues. So, you know, you have last chance agreement. Then on your second or third offense, you get terminated. And then it comes up to one of these reviewing courts such as this one. There's Alexander versus post office. That's out of this court. There's Gutierrez out for the postal service. I think one or two of these involve postmasters. But you could say, but they're not postmasters involving voyager cards. So some involve voyager cards, like this case, misappropriation. Some involve postmasters. But do they involve postmasters misappropriating voyager cards? So maybe the puzzle pieces don't totally fit together. So if I'm asking you just to pick one, which of that litany would you pick? You know, I would say, I mean, a case out of this court, Bethleveed v. U.S. Postal Service. Or that MSPP case, July 5th, 2023. You're asking for a circuit opinion. There's a lot of cases here. Well, this is true. I will give you that and spot you that. I'm asking you to pick one case from this court. Just one. Well. And if you can't pick one, you can just tell me you can't pick one. You know, I would say to look at Alexander versus postal service. That's a 2001 decision out of this federal circuit. I think that's a very important case involving postal service. There's a lot. I think, again, Judge Moore, I think you're right. Ms. Campbell should not have done this. She knows that. But the penalty was very, very harsh. And I don't think all of the Douglas and Singh factors were considered here. I hope that this court can provide a remedy and give her something other than termination. Unless there's any other questions, I'd like to thank the court for its consideration. We thank both counsel. The case is taken under submission.